## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| BRENDA SHAFFER, RONALD CLEMONS, JERRY WATKINS, JAMAUN, RANSOM, ALAN FRAILICH, NANCY, POFF, LEROY MOTON, DONALD YOUNG, CHERYL JONES LATIMER, and IDA NAPOLITANO, | ) ) ) ) ) ) | Case No: 3:20-CV-01572 |
| Plaintiffs, | ) ) ) ) ) ) | Removed from the 101st Judicial District Court of Dallas County, Texas, Case No. DC-20-04477 |
| vs. | ) ) ) | |
| C. R. BARD, INC., a foreign corporation; BARD PERIPHERAL VASCULAR, INC., an Arizona corporation; MCKESSON CORPORATION, a corporation; and DOES 1 THROUGH 100 INCLUSIVE | ) ) ) ) ) ) | **JURY TRIAL DEMANDED ON ALL COUNTS** |
| Defendants. | ) ) ) | |

## NOTICE OF REMOVAL

PLEASE TAKE NOTICE that Defendants C. R. Bard, Inc. ("C. R. Bard") and Bard Peripheral Vascular, Inc. ("BPV") (C. R. Bard and BPV are collectively referred to herein as "the Bard Defendants" or "Bard"), remove this action from the 101st Judicial District Court of Dallas County, Texas to the United States District Court for the Northern District of Texas, Dallas Division, based on diversity jurisdiction pursuant to 28 U.S.C. §§ 1332, 1441(a) and 1446(b), and Plaintiffs' improper joinder of parties to avoid federal diversity jurisdiction.

As explained below, the United States District Court for the Northern District of Texas, Dallas Division, has original subject matter jurisdiction of this civil action—which combines the

product liability claims of 10 unrelated Plaintiffs—pursuant to 28 U.S.C. § 1332(a) because there is complete diversity of citizenship among all properly joined and served parties, and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

In support of this removal, Bard respectfully shows this Court as follows:

<u>**INTRODUCTION**</u>

1.      As of the date of this Notice, Plaintiffs' counsel filed and served 49 separate multi-plaintiff products liability cases in Dallas County District Court against C. R. Bard (a NJ corporation and citizen), BPV (an AZ corporation and citizen), and McKesson Corporation (a DE and TX corporation and citizen) ("McKesson Corp.") allegedly relating to Bard's Inferior Vena Cava ("IVC") filters. This is one of those cases.

2.      These 49 cases were patently constructed in an improper attempt to circumvent federal diversity jurisdiction — each case has a single Texas plaintiff, and the remaining plaintiffs in each case are from various states throughout the country. Each case's lone Texas plaintiff was included to try to destroy diversity of citizenship as to McKesson Corp.[1] But, as explained below, McKesson Corp. is fraudulently joined; therefore, its citizenship should be disregarded for purposes of determining subject matter jurisdiction.

3.      Additionally, many of the cases, like this one, have an Arizona plaintiff to destroy diversity as to BPV[2] and/or a New Jersey plaintiff to destroy diversity as to C. R. Bard[3]. Yet, these plaintiffs are also fraudulently joined and, like all the plaintiffs in each case, their claims

---

[1] Defendant McKesson Corp. is a Delaware Corporation with its principal place of business in Texas. Thus, McKesson Corp. is a citizen of Delaware and Texas. *See* Paragraph 23, *infra*.
[2] Defendant BPV is an Arizona corporation with its principal place of business in Arizona. Thus, BPV is an Arizona citizen. *See* Paragraph 22, *infra*.
[3] Defendant C. R. Bard is a New Jersey Corporation with its principal place of business in New Jersey. Thus, C. R. Bard is a New Jersey citizen. *See* Paragraph 21, *infra*.

are fraudulently misjoined. Accordingly, these diversity-destroying plaintiffs' citizenships should also be disregarded for purposes of determining subject matter jurisdiction.

4.      This action combines the claims of 10 unrelated Plaintiffs related to their alleged personal injuries arising from implantation of one of the various models of IVC filters that were manufactured, designed, and distributed by the Bard Defendants.[4] *See* Petition at ¶¶ 13-14, 30. IVC filters are prescription medical devices designed to prevent potentially fatal blood clots from migrating from patients' hips and legs to their lungs and causing a potentially fatal event.

5.      Each of the Plaintiffs alleges where he or she received his or her filter, and that he or she "is, and was at all times material herein, a resident of" each Plaintiff's home city and state. (*Id.* at ¶¶ 3-12; 90-116.)

6.      The Plaintiffs are citizens of different states. One Plaintiff is allegedly from Arizona, and one Plaintiff is allegedly from Texas. The remaining Plaintiffs are from the following states: Kansas, Kentucky, Nevada, Florida, Connecticut, and Rhode Island. *See id.* at ¶¶ 3-12. (The non-Texas Plaintiffs will be collectively referred to as the "out-of-state Plaintiffs").

7.      In addition to the Bard Defendants, Plaintiffs also name McKesson Corp. as a Defendant. Yet, Plaintiffs' 38-page, 183 paragraph Petition only has two sentences devoted to their claims against McKesson Corp. *See* Plaintiff's Petition ¶ 16. Plaintiffs allege that "McKesson's business included designing, launching, marketing, establishing, and administering the Bard Reach [program], a marketing initiative designed to ensure patients implanted with Bard IVC filters are tracked for follow up care or retrieval of the filter." *Id.* Plaintiffs then allege that

---

[4] Bard notes that it has distributed six different retrievable IVC filters, including the Recovery® Filter, G2® Filter, G2®X/G2 Express® Filter, Eclipse® Filter, Meridian® Filter, and Denali® Filter.

through the Reach program, "[o]n information and belief, Defendant McKesson marketed the Bard Filters with which the Plaintiffs were each implanted." *Id.*

8.       Notably, Plaintiffs fail to plead any facts showing that (1) after implant of a Bard IVC filter, each Plaintiff was actually enrolled in the Bard Reach program by his or her physician, and (2) that enrollment in the program ***after filter implant*** caused his or her filter-related injuries. *See id.* Outside of the two sentences quoted in the preceding paragraph, Plaintiffs' Petition does not contain any further factual allegations related to claims against McKesson Corp. or the Reach program. Nor does the Petition describe how McKesson Corp., specifically, could possibly be liable for any of Plaintiffs' legal claims.[5] In fact, neither the Reach program nor McKesson Corp. is mentioned outside of that one paragraph in Plaintiffs' Petition.

9.       After the two sentences related to Plaintiffs' claims against McKesson Corp. and the Reach program, Plaintiffs incorporate McKesson Corp. into the collective term "Defendants" along with Bard. Yet, in violation of the federal pleading standard, Plaintiffs fail to distinguish McKesson Corp.'s alleged wrongful acts (related to the Reach program that McKesson Corp. allegedly administered for Bard after some patients received their IVC filters) from those of the Bard Defendants (related to the manufacture, design, and distribution of IVC filters).[6] *See* Plaintiffs' Petition ¶¶ 125-182.

---

[5] The causes of action in the complaint are as follows: Count One – Negligence, Count II – Strict Product Liability – Information Defect, Failure to Warn, Count III – Strict Product Liability – Design Defect, Count IV – Strict Product Liability – Manufacturing Defect, and Count V – Negligent Misrepresentation. *See* Petition ¶¶ 125-177. Plaintiffs also claim they are entitled to punitive damages. *Id.*

[6] Beyond mention of McKesson Corp. in the introductory paragraphs related to establishing the parties and the two sentences about Plaintiffs' claims against McKesson Corp. quoted, *supra*, the Petition reads like all the other IVC filter complaints that have been filed in state and federal courts across the country against Bard without McKesson Corp. as a co-defendant. *See* Petition ¶¶ 30-177.

10.    McKesson Corp. is fraudulently joined to this action because there is no reasonable factual basis for this Court to predict that Plaintiffs can recover against McKesson Corp. on their allegations related to the Reach program. First, McKesson Corp. did not have any involvement in the Reach program—Plaintiffs named the wrong corporation. Instead, Bard contracted with McKesson Specialty Arizona Inc., a Delaware corporation with its principal place of business in Scottsdale, Arizona, to administer the Reach program. Second, Plaintiffs' Petition contains no facts showing that each Plaintiff was enrolled in the Reach program and, even if they were, how the Reach program (which was administered post-implant) had any causal relationship to each Plaintiff's filter-related injuries.

11.    Additionally, the out-of-state Plaintiffs' claims against Bard are fraudulently joined, and all of the Plaintiffs' claims against Bard are fraudulently misjoined. Even though the Plaintiffs are from different states and their claims are dissimilar (different IVC filters, different medical conditions leading to filter implant, different places of implant and subsequent filter-related procedures, different filter-related physicians and medical treatment, different alleged failures of their IVC filters, different alleged injuries, and different state laws controlling substantive claims), the Plaintiff from Arizona has been joined into one action with Plaintiffs from the other states listed in Paragraph 6, *supra*, ostensibly in an attempt to defeat federal diversity jurisdiction as to the Bard Defendants.

12.    Yet, the citizenship of the Plaintiff from Arizona should be ignored for purposes of determining subject matter jurisdiction because her claims have been both fraudulently joined and fraudulently misjoined. The Arizona Plaintiff is fraudulently joined in this case because no court of original jurisdiction in Texas has personal jurisdiction over her claims against Bard, and, thus, she cannot recover against Bard in any Texas court. Additionally, the Arizona Plaintiff's

claims, along with all the other Plaintiffs' claims, are fraudulently misjoined because their claims do not arise out of the same transaction, occurrence, or series of transactions or occurrences.

13.     After disregarding the citizenship of Defendant McKesson Corp. because it has been fraudulently joined, and disregarding the citizenship of the Arizona Plaintiff because she has been fraudulently joined and fraudulently misjoined, there is complete diversity of citizenship between the remaining Plaintiffs and Defendants C. R. Bard and BPV (the properly joined Defendants).

14.     Once this federal action is open, Bard will promptly file a motion to dismiss the claims of all non-Texas Plaintiffs based on lack of personal jurisdiction.

## NOTICE OF REMOVAL IS TIMELY

15.     On May 20, 2020, C. R. Bard and BPV were served with the Plaintiffs' Petition. This Notice of Removal is filed before the expiration of 30 days after the receipt by Bard, through service or otherwise, of a copy of the initial pleading in this matter setting forth Plaintiffs' claims for relief. *See* 28 U.S.C. § 1446(b). Accordingly, Bard's Notice of Removal is timely filed.

## JURISDICTION AND VENUE

16.     This Court has jurisdiction over this removed action under 28 U.S.C. §§ 1332 and 1441. Pursuant to 28 U.S.C. § 1332(a), this Court has original jurisdiction over this action because complete diversity of citizenship exists between the properly joined Bard Defendants and the Plaintiffs who are properly joined, and the amount in controversy exceeds $75,000.00.

### A.     Venue is Proper

17.     The United States District Court for the Northern District of Texas includes the county in which the state court action is now pending (Dallas County), and, thus, pursuant to 28 U.S.C. § 124(a), venue is proper.

### B.        The Amount-in-Controversy Requirement is Satisfied

18.      Plaintiffs' Petition states that they are seeking monetary relief of over $1,000,000. *See* Petition at ¶ 24. In addition, Plaintiffs claim that Bard should be liable for punitive damages. *See id.* at ¶¶ 173-177. It is widely recognized that personal injury claims in pharmaceutical and medical device cases meet the $75,000.00 jurisdictional threshold. *See, e.g.*, *In re Rezulin Prods. Liab. Litig.*, 133 F. Supp. 2d 272, 296 (S.D.N.Y. 2001) (finding that a complaint alleging various injuries from taking a prescription drug "obviously asserts a claim exceeding $75,000"). Accordingly, without admitting liability or conceding that the Plaintiffs are, in fact, entitled to recover any damages, Bard states that it has a good-faith belief that the amount in controversy in this action exceeds $75,000.00, exclusive of interests and costs. *See White v. FCI USA, Inc.*, 319 F.3d 672, 674 (5th Cir. 2003) (amount in controversy requirement is satisfied "if the plaintiff claims a sum greater than the jurisdictional requirement.") (citation omitted); *St. Paul Reinsurance Co. Ltd. v. Greenburg*, 134 F.3d 1250, 1253 n.13 (5th Cir. 1998) (the test is whether it is more likely than not that the amount of the claim will exceed the jurisdictional amount).

### C.        Complete Diversity of Citizenship Exists Between All Properly Joined
###            and Served Parties

19.      At the time this action was filed, and at all times since, Defendant C. R. Bard was and is a New Jersey corporation with its principal place of business in the State of New Jersey. Therefore, C. R. Bard is a citizen of New Jersey. *See* 28 U.S.C. § 1332(c).

20.      At the time this action was filed, and at all times since, Defendant BPV was and is an Arizona corporation with its principal place of business in the State of Arizona. Therefore, BPV is a citizen of Arizona. *Id.*

21.     At the time this action was filed, and at all times since, upon information and belief, Defendant McKesson Corp. was and is a Delaware corporation with its principal place of business in the State of Texas. Therefore, McKesson Corp. is a citizen of Delaware and Texas. *Id.* But, for purposes of determining diversity of citizenship, McKesson Corp.'s citizenship should not be considered because it has been fraudulently joined to this action in an attempt to defeat federal diversity jurisdiction.

22.     The Petition alleges that Plaintiffs are residents of—and upon information and belief, Bard states that Plaintiffs are citizens of—the following states:

| | |
|---|---|
| Brenda Shaffer: | Texas |
| Ronald Clemons: | Kansas |
| Jerry Watkins: | Kentucky |
| Jamaun Ransom: | Kentucky |
| Alan Frailich: | Nevada |
| Nancy Poff: | Florida |
| Leroy Moton: | Connecticut |
| Donald Young: | Rhode Island |
| Cheryl Jones-Latimer: | Arizona |
| Ida Napolitano: | Connecticut |

*See Petition* ¶¶ 3-12.

23.     Defendants C. R. Bard and BPV, the properly joined defendants, are diverse in citizenship from all Plaintiffs except Plaintiff Cheryl Jones-Latimer. Yet, Plaintiff Cheryl Jones-Latimer is fraudulently joined and fraudulently misjoined in this case in an attempt to defeat this Court's diversity jurisdiction, and, thus her citizenship should not factor into this Court's analysis.

24.     Accordingly, there is complete diversity of citizenship among all properly joined Defendants and Plaintiffs.

>           **i.     Defendant McKesson Corp. as Well as the Arizona Plaintiff Are Fraudulently Joined**

25.     Fraudulent joinder, which is also known as improper joinder, is an exception to the rule requiring complete diversity of citizenship. *See Smallwood v. Illinois Cent. R. Co.*, 385 F.3d 568, 573 (5th Cir. 2004) (Fraudulent joinder "entitle[s] a defendant to remove to a federal forum unless an in-state defendant has been properly joined.") The doctrine allows federal courts to defend against attempts to manipulate their jurisdiction, such as by joining nondiverse parties solely to deprive federal courts of diversity jurisdiction. *See id.* at 576. The Firth Circuit Court of Appeals "recognize[s] two ways to establish improper joinder: (1) actual fraud in the pleading of jurisdictional facts, or (2) inability of the plaintiff to establish a cause of action against the non-diverse party in state court." *Id.* at 573. The second type of fraudulent joinder is at issue here.

26.     To establish that a party has been fraudulently joined, the removing party must demonstrate that "that there is no possibility of recovery by the plaintiff against [a non-diverse] defendant, which stated differently means that there is no reasonable basis for the district court to predict that the plaintiff might be able to recover against [a non-diverse] defendant." *Id.* "This possibility [of recovery], however, must be reasonable, not merely theoretical." *Malone v. Blue Cross & Blue Shield of Texas, Inc.*, 2019 WL 7987110, at *2 (N.D. Tex. Apr. 8, 2019) (citing *Great Plains Trust Co. v. Morgan Stanley Dean* 313 F.3d 305, 312 (5th Cir. 2002)).

27.     Defendants as well as plaintiffs can be fraudulently joined in a case. *See, e.g.*, *Oliva v. Chrysler Corp.*, 978 F. Supp. 685, 689 (S.D. Tex. 1997) ("The citizenship of a party-plaintiff may also be disregarded for purposes of determining whether diversity jurisdiction exists if the removing party can show that the nondiverse plaintiff was fraudulently joined.").

28.     To analyze whether there is a reasonable basis for recovery under state law, the Court "may conduct a Rule 12(b)(6)-type analysis, looking initially at the allegations of the complaint to determine whether the complaint states a claim under state law against the [non-

diverse] defendant." *See Smallwood*, 385 F.3d at 573. When performing this analysis, "federal courts must use the federal pleading standard, not the Texas "fair notice" pleading standard, in conducting a Rule 12(b)(6)-type analysis for improper joinder." *Malone*, 2019 WL 7987110 at *3 (citing *Int'l Energy Ventures Mgmt., L.L.C. v. United Energy Grp., Ltd.*, 818 F.3d 193, 200-02 (5th Cir. 2016)).

29.     To meet the federal pleading requirements of Rule 8, as enforced by Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Id.* (quoting *Twombly*, 550 U.S. at 555). "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Id.* (quoting *Twombly*, 550 U.S. at 557). "Factual allegations must be enough to raise a right to relief above the speculative level[.]" *Twombly*, 550 U.S. at 555 (citation omitted).

30.     The Court may also "pierce the pleadings" and consider summary judgment-type evidence as to "discrete facts that would determine the propriety of joinder." See *Malone*, 2019 WL 7987110, at *3 (citing *Smallwood*, 385 F.3d at 573); *Arana v. Allstate Texas Lloyds*, 2013 WL 2149589, at *2 (N.D. Tex. May 17, 2013).

31.     Furthermore, the Court looks to a plaintiff's pleading at the time of removal. *See Cavallini v. State Farm Mut. Auto Ins. Co.*, 44 F.3d 256, 264 (5th Cir. 1995). The Court cannot consider a plaintiff's post-removal documents that "present new causes of action or theories not

raised in the original state court complaint." *See Griggs v. State Farm Lloyds*, 181 F.3d 694, 700 (5th Cir. 1999).

32.     When a party is fraudulently joined to a case, its citizenship must be disregarded for the purposes of determining diversity jurisdiction. *See, e.g.*, *Malone*, 2019 WL 7987110 at *3.

> **1.     Defendant McKesson Corp. is Fraudulently Joined Because Plaintiffs' Petition Does Not Provide a Reasonable Basis Showing That Each Plaintiff Can Recover Against McKesson Corp.**

33.     Plaintiffs' Petition does not contain requisite factual support relating to their claims against McKesson Corp. to meet the federal pleading requirement and does not provide a reasonable basis for this Court to predict that Plaintiffs can recover against McKesson Corp. Accordingly, McKesson Corp. is fraudulently joined to this action.

34.     Plaintiffs' Petition contains only two sentences specifically addressing their legal claims against McKesson Corp. *See* Plaintiff's Petition ¶ 16. Plaintiffs allege that "McKesson's business included designing, launching, marketing, establishing, and administering the Bard Reach [program], a marketing initiative designed to ensure patients implanted with Bard IVC filters are tracked for follow up care or retrieval of the filter." *Id.* Plaintiffs then claim, without any factual support whatsoever, that through the Reach program, "[o]n information and belief, Defendant McKesson marketed the Bard Filters with which the Plaintiffs were each implanted."[7] *Id.* McKesson Corp. is fraudulently joined for five reasons.

---

[7] In Paragraph 16 of the Petition, Plaintiffs also allege that McKesson Corp. is generally in the business of distributing "medical supplies." But, Plaintiffs do not provide any facts supporting the notion that McKesson Corp. distributed Bard IVC filters and, more pertinently, the Bard IVC

35.     *First*, McKesson Corp. is fraudulently joined because McKesson Corp. did not have any involvement in the Reach program—Plaintiffs named the wrong corporation. Bard contracted with a different corporation, McKesson Specialty Arizona Inc., a Delaware corporation with its principal place of business in Scottsdale, Arizona, to administer the Reach program. *See* first page and Exhibit A to the February 1, 2011 Services Agreement for the Reach program between Bard Peripheral Vascular, Inc. and McKesson Patient Relationship Solutions, a division of McKesson Specialty Arizona, Inc., attached as **Exhibit A**; Georgia Secretary of State Business Information for McKesson Specialty Arizona, Inc., attached as **Exhibit B**. Because McKesson Corp. did not have any involvement with Bard's Reach program, there is no actionable claim against McKesson Corp., and it is therefore fraudulently joined to this action. *See e.g.*, *Galvan v. Bonner*, 2005 WL 1774102, at *2 (S.D. Tex. July 25, 2005) (noting that dismissal is proper where plaintiff sued the wrong defendant).

36.     **Second**, even if McKesson Corp. did contract with Bard to administer the Reach program (which it did not) and could be subject to liability for Plaintiffs' claims (which it cannot), McKesson Corp. is still fraudulently joined because Plaintiffs' Petition does not provide any of the necessary factual support to show this Court there is a reasonable basis to predict that each Plaintiff could recover against McKesson Corp.

37.     After the two sentences specifically addressing Plaintiffs' claim against McKesson Corp. in Paragraph 16 of the Petition, the pleading incorporates McKesson Corp. into the term

---

filters that were implanted in each Plaintiff. Facts showing that McKesson Corp. distributed the IVC filters implanted in each Plaintiff are necessary to state a plausible distribution claim and prevent a finding of fraudulent joinder. *See, e.g.*, *In re Taxotere (Docetaxel) Prod. Liab. Litig.*, 2020 WL 598043, at *2 (E.D. La. Feb. 7, 2020). Yet, there is no evidence that McKesson Corp. distributed the IVC filters implanted in each Plaintiff because there is no distribution agreement for IVC filters between McKesson Corp. and Bard.

"Defendants," along with the Bard Defendants. But, starting with the General Factual Allegations Section (Paragraph 30) and moving all the way through Plaintiffs' legal claims and claims for damages ending at Paragraph 182, all of the factual and legal allegations actually relate solely to Bard's design, manufacture, and distribution of IVC filters and not to McKesson Corp.'s alleged conduct related to the Reach program. In fact, no allegations in the Petition outlining Plaintiffs' substantive legal claims (s*ee* Petition ¶¶ 125-177) even reference the Reach program or McKesson Corp., let alone provide any factual support showing how McKesson Corp.'s alleged "marketing" program to, at the physicians' request, call patients and remind them to make an appointment with their doctor related to potential filter retrieval was deficient or breached any duty owed to the Plaintiffs owed under Texas or any other state's law.

38.     Nor do Plaintiffs present any information showing how it is even possible that these phone call reminders ***made after patients' filters were implanted*** constitutes "marketing" of Bard's filters or how these reminder phone calls could have caused their IVC filter-related injuries. In short, the Petition is ***entirely void*** of legal allegations and factual support showing how or why McKesson Corp. is liable.

39.     As other courts have found in similar situations, Plaintiffs' allegations targeted at "Defendants" generally—rather than McKesson Corp. in particular—are insufficient to state a claim against McKesson Corp. and also demonstrate that McKesson Corp. is fraudulently joined in this case.[8] *See, e.g.*, *Beavers v. DePuy Orthopaedics, Inc.*, 2012 WL 1945603 (N.D. Ohio May

---

[8] For example, in Plaintiffs' first cause of action for negligence, they allege that "Defendants designed, manufactured, marketed, inspected, labeled, promoted, distributed, and sold the Bard Filter implanted in Plaintiffs." *See* Plaintiff's Petition ¶ 127. This type of pleading, where plaintiffs do not distinguish between the activities of each defendant, is not sufficient to state claim against McKesson Corp. or factually establish that McKesson Corp. did any of these things. It is also illustrative that in the preceding paragraph, Plaintiffs specifically state that the Bard defendants

30, 2012) (finding distributor fraudulently joined in ASR-hip case where plaintiffs' 89-paragraph complaint only mentioned the distributor twice, with the remainder of the paragraphs "fail[ing] to distinguish between the DePuy Defendants' allegedly wrongful acts and those of [the distributor]"); *Shah v. Wyeth Pharms., Inc.*, 2005 WL 6731641, at *3 (C.D. Cal. Jan. 18, 2005) ("allegations against 'defendants' collectively are insufficient to warrant remand, especially when plaintiffs fail to allege any 'particular or specific activity'" on the part of each of the non-diverse defendants) (*citing Badon v. RJR Nabisco, Inc.*, 224 F.3d 382, 391-92 (5th Cir. 2000)).

40.     The Petition does not contain even the most basic, necessary facts relating to Plaintiffs' claim against McKesson Corp. that would allow the Court to reasonably infer that they can recover against it. For example, ***the Petition contains no facts to support that each Plaintiff was ever enrolled in the Reach program***. This deficiency alone makes Plaintiffs' claims against McKesson Corp. fall well below the federal pleading standard. Plaintiffs' conclusory statement that "[o]n information and belief, Defendant McKesson marketed the Bard Filters with which the Plaintiffs were each implanted" is exactly the type of naked assertion, devoid of factual enhancement, that the Supreme Court prohibited in *Iqbal* and *Twombly*. *See* Petition at ¶ 16.

41.     Thus, the Petition leaves the Court to speculate as to whether any of the Plaintiffs were actually enrolled in the Reach program. Accordingly, there is no reasonable basis for this Court to predict that McKesson Corp. is liable to Plaintiffs because of its alleged administration of the Reach program because each Plaintiff failed to plead any concrete facts that their physician actually enrolled them in the Reach program.[9] In short, McKesson Corp. is fraudulently joined

---

(and not McKesson Corp.) "were in the business of designing, developing, setting specifications, manufacturing, marketing, selling, and distributing the Bard Filter." *Id.* at ¶ 126.

[9] Bard notes that each Plaintiff would have personal knowledge of whether he or she was enrolled in the Reach program. If a Plaintiff was enrolled, he or she would have received phone calls and/or voice messages from a McKesson Specialty Arizona, Inc. representative after his or her Bard IVC

because there are no facts linking each Plaintiff to the Reach program. *See*, *e.g.*, *In re Taxotere (Docetaxel) Prod. Liab. Litig.*, 2020 WL 598043, at \*2 (E.D. La. Feb. 7, 2020) (ruling McKesson was fraudulently joined in a product liability case against a drug manufacturer when the plaintiffs presented no facts to show that McKesson distributed the drug that was ingested by each plaintiff.).

42.     ***Third***, there is also no basis for the Court to reasonably predict that Plaintiffs could recover against McKesson Corp. because the actual facts show that the Reach program did not consist of any activities that could subject a company to liability under Texas or any other state's law. Plaintiffs' Petition alleges that McKesson Corp. "marketed" Bard IVC filters through the Reach program. But, utilizing even the most expansive definition of the word, the facts show that the Reach program had nothing to do with marketing Bard's IVC filters. Additionally, as a matter of logic, McKesson Corp. could not have marketed a Bard IVC filter to any of the Plaintiffs or their physicians because the Reach program began after a patient was already implanted with a Bard filter. **Exhibit C**, Bard 30(b)(6) Reach Deposition at 30:2-31:7. Hence, there was nothing to market or sell.

43.     Bard's IVC filters are retrievable, which means that physicians have an option to retrieve the filters if they determine that it is no longer medically necessary. The Reach program, which was created by Bard and administered by McKesson Specialty Arizona, Inc., is simply a phone call reminder program where a McKesson Specialty Arizona, Inc. representative would, at the doctors' request, call patients and remind them to schedule a follow-up appointment with

---

filter was implanted related to physician follow-up for potential retrieval of the filter. *See* August 30, 2016 deposition of Kimberly Romney as Bard's 30(b)(6) corporate witness related to the Reach program ("Bard 30(b)(6) Reach Deposition"), 91:7-93:10, 105:4-20, relevant portions attached as **Exhibit C**.

their physician related to potential removal of the filter. *See Id.* at 30:2-31:7, 91:7-93:10, 105:4-20, 112:6-18, 291:1-292:13. After implant of a Meridian or Denali filter, a physician could elect to enroll that patient into the Reach program. *Id.* The physician would then provide two dates: (1) The date when the patient will be home after filter implant, and (2) the date when the physician wanted to see the patient for follow-up related to potential filter retrieval. *Id.* Around the time when the patient was home after filter implant, a McKesson Specialty Arizona, Inc. representative would call the patient to remind him or her that the implanting physician wants to see the patient for a follow-up appointment related to potential filter retrieval on the date pre-specified by the physician. *Id.* The McKesson Specialty Arizona, Inc. employee would then ask the patient if they would like a future phone call closer to the date his or her physician specified for a follow-up appointment, and if the patient consents, McKesson Specialty Arizona, Inc. would call the patient a second time to remind them to schedule a consultation or attend the appointment they already made. *Id.* This is the entirety of the Reach program. Because McKesson Corp. did not market, sell, distribute, or promote Bard's IVC filters, there is no possibility that Plaintiffs can recover under Texas or any other state's law on any claim related to their allegation that McKesson Corp. "marketed" Bard's IVC filters.

44.     ***Fourth***, even if McKesson Corp. did market Bard's IVC filters (which it did not), and even if there was a showing that each of the Plaintiffs were enrolled with the Reach program (which there is not), Plaintiffs' Petition would still fails to state a claim or provide any reasonable basis for the Court to predict that Plaintiffs could recover against McKesson Corp. under Texas[10] law.

---

[10] Plaintiffs allege that McKesson Corp.'s national corporate headquarters and principal place of business is located in Texas and that that McKesson Corp. committed its alleged tort in Texas,

45.     Because this case is grounded in product liability, the Texas Products Liability Act, Tex. Civ. Prac. & Rem.Code Ann. §§ 82.001-82.008 governs Plaintiffs' claims against McKesson Corp. regarding the Reach program. *See Meritor Automotive, Inc. v. Ruan Leasing Co.*, 44 S.W.3d 86, 91 (Tex. 2001) ("[A] 'products liability action' includes not only products liability claims but also other theories of liability properly joined thereto, such as the allegation of negligence."); *Moses v. Zimmer Holdings, Inc.*, 2007 WL 3036096, at *4 (S.D. Tex. June 29, 2007). This Act defines a "product liability action" as "any action against a **manufacturer** or **seller** for recovery of damages arising out of personal injury, death, or property damage allegedly caused by a defective product whether the action is based in strict tort liability, strict products liability, negligence, misrepresentation, breach of express or implied warranty, or any other theory or combination of theories." Tex. Civ. Prac. & Rem.Code. Ann. § 82.001(2) (emphasis added). Because there is no evidence that McKesson Corp. was a "manufacturer" or "seller," as those terms are defined in § 82.001(2), Plaintiffs cannot bring a product liability action against McKesson Corp.

46.     Even if Plaintiffs could show that McKesson Corp. was a "seller" (which they cannot), McKesson Corp. would be considered an "innocent non-manufacturing seller" that is immune from liability because Plaintiffs have presented no evidence that McKesson Corp. engaged in any of the conduct that could subject it to liability under Tex. Civ. Prac. & Rem.Code. Ann. § 82.003.

47.     Assuming for the sake of argument that Plaintiffs could overcome those statutory hurdles, which they cannot, Plaintiffs still have no reasonable likelihood of success on their claim

---

presumably related to the Reach program. *See* Petition ¶¶ 23, 26-27. Accordingly, Texas has the most significant relationship to Plaintiffs' claims against McKesson Corp.

against McKesson Corp. Because Bard's IVC filters are prescription medical devices inserted by physicians, Texas applies the learned intermediary doctrine and treats claims of negligent or defective marketing as failure to warn claims. *See, e.g.*, *Gonzalez v. Bayer Healthcare Pharm.*, Inc., 930 F. Supp. 2d 808, 820 (S.D. Tex. 2013) (treating plaintiff's marketing defect and negligence claims for a prescription medical device as failure to warn claims and applying the learned intermediary doctrine). The Reach program's involvement with Bard's filters began ***after*** the filters were sold to the physician group or hospital. Because "Texas courts generally do not recognize any post-sale duty to warn of product hazards arising after the sale," McKesson Corp. would not be liable for any alleged failure to warn each Plaintiff's learned intermediary. *McLennan v. Am. Eurocopter Corp.*, 245 F.3d 403, 430 (5th Cir. 2001).

48.     Additionally, "[i]n a failure to warn case, the plaintiff must show that the warning was defective and that this failure to warn was the producing cause of the plaintiff's injury." *In re Norplant Contraceptive Prod. Liab. Litig.*, 955 F. Supp. 700, 703 (E.D. Tex. 1997). Here, Plaintiffs have not alleged facts showing that McKesson Corp. provided any warnings or instructions to each Plaintiff's physician, that such warnings or instructions were inadequate, or that any allegedly inadequate warnings or instructions to each Plaintiff's physician related to the physicians' decision to implant a Bard IVC filter and was the proximate cause of injury. Accordingly, because of this deficient pleading, Plaintiffs cannot show that they have a reasonable likelihood of recovery against McKesson Corp.[11] *See, e.g.*, *Gonzalez*, 930 F. Supp.

---

[11] Even if the Court did not apply the learned intermediary doctrine and did not convert Plaintiff's marketing claims against McKesson Corp. into a failure to warn claim, McKesson Corp. is still fraudulently joined because Plaintiffs pled no facts to support claims for negligent or defective marketing under Texas law. A negligent marketing claim has four elements: "1) a duty by appellant to act according to an applicable standard of care; 2) a breach of the applicable standard of care; 3) an injury; and 4) a causal connection between the breach of care and the injury." *Ethicon Endo-Surgery, Inc. v. Gillies*, 343 S.W.3d 205, 211 (Tex. App. 2011). A defective marketing claim has

2d at 821 (granting defendant's motion to dismiss for failure to state a claim as to all of the plaintiff's claims, including marketing defect); *Malone*, 2019 WL 7987110, at *7 (defendants fraudulently joined because plaintiffs' pleading did not show that they could succeed on any claims against them under Texas law).

49. ***Fifth***, and finally, McKesson Corp. is fraudulently joined because of the inconsistency in pleading within Plaintiffs' Petition. Federal Courts have found that a finding of fraudulent joinder is appropriate where the facts pleaded "are impossible or fatally inconsistent." *See In re Avandia Mktg., Sales Practices & Prod. Liab. Litig.*, 624 F. Supp. 2d 396, 418 (E.D. Pa. 2009); *see also In re Phenylpropanolamine (PPA) Prod. Liab. Litig.*, 2002 WL 34418423, at *3 (W.D. Wash. Nov. 27, 2002) (allegations that "manufacturer defendants concealed material facts regarding PPA through product packaging, labeling, advertising, promotional campaigns and materials, and other methods . . . directly undermines and contradicts the idea that [the resident retail defendant] had knowledge or reason to know of alleged defects"). Here, Plaintiffs allege that the Bard Defendants fraudulently concealed "the true character, quality, and nature of the [IVC Filters] that [were] implanted in Plaintiffs." *See* Plaintiff's Petition ¶ 120. However, if the Bard defendants concealed this information, McKesson Corp. could not have known it or disclosed it during its alleged "marketing" of Bard's IVC filters.

---

five elements: "(1) a risk of harm that is inherent in the product or that may arise from the intended or reasonably anticipated use of the product must exist, (2) the product supplier must actually know or reasonably foresee the risk of harm at the time the product is marketed, (3) the product must possess a marketing defect, (4) the absence of the warning or instructions must render the product unreasonably dangerous to the ultimate user or consumer of the product, and (5) the failure to warn or instruct must constitute a causative nexus in the product user's injury." *Ethicon Endo-Surgery, Inc. v. Meyer*, 249 S.W.3d 513, 516 (Tex. App. – Fort Worth 2007, no pet.). In addition to the essential element of causation, Plaintiffs' Petition fails to show establish all of these elements as they relate to a marketing claim against McKesson Corp. related to the Reach program.

50.     Because McKesson Corp. is fraudulently joined to this action, its citizenship must be disregarded for the purposes of determining subject matter diversity jurisdiction. *See Malone,* 2019 WL 7987110 at \*3.

> **2.     The Arizona Plaintiff is Fraudulently Joined Because There is No Personal Jurisdiction Over Her Claims Against The Bard Defendants, And Therefore She Cannot Recover.**

51.     Because McKesson Corp. is fraudulently joined (*see* preceding section), C. R. Bard and BPV are the only properly joined defendants in this case. Therefore, only the Bard Defendants' citizenships are determinative during a diversity of citizenship analysis.

52.     As further explained below and in Bard's forthcoming Motion to Dismiss For Lack of Personal Jurisdiction, which is incorporated herein, this Court, and any court of original jurisdiction sitting in Texas, lacks personal jurisdiction over the Arizona Plaintiff's claims against the Bard Defendants. Accordingly, that Plaintiff is fraudulently joined because she cannot recover against Bard, and her citizenship should be disregarded for purposes of determining diversity jurisdiction among the properly joined defendants.

53.     Each plaintiff in a multi-plaintiff action must establish personal jurisdiction relating to each individual claim. *See Seiferth v. Helicopteros Atuneros, Inc.*, 472 F.3d 266, 274-75 (5th Cir. 2006) ("Permitting the legitimate exercise of specific jurisdiction over one claim to justify the exercise of specific jurisdiction over a different claim that does not arise out of or relate to the defendant's forum contacts [] violate[s] the Due Process Clause."); *In re Testosterone Replacement Therapy Prod. Liab. Litig. Coordinated Pretrial Proceedings*, 164 F. Supp. 3d 1040, 1047 (N.D. Ill. 2016) ("[T]he specific jurisdiction inquiry in this case must be conducted separately for the claims of each individual plaintiff."). The Supreme Court recently

reiterated that the "primary concern" when courts analyze personal jurisdiction is "the burden on the defendant." *See Bristol-Myers Squibb Co. v. Superior Court of California, San Francisco Cty.*, 137 S. Ct. 1773, 1780 (2017) (citation and internal quotation omitted)).

54.     It is the Plaintiffs' burden to allege actual facts, not "conclusory allegations," that demonstrate personal jurisdiction. *See Innova Hosp. San Antonio, L.P. v. Blue Cross & Blue Shield of Georgia, Inc.*, 995 F. Supp. 2d 587, 615 (N.D. Tex. 2014) (noting that "the court need not credit conclusory allegations, even if uncontroverted" when determining if personal jurisdiction exists.). The Arizona Plaintiff unquestionably falls short of her burden, failing to allege even one specific, non-conclusory fact that would support a Texas court's exercise of general or specific personal jurisdiction over the Bard Defendants with respect to her claims.

55.     Personal jurisdiction can be general or specific. *Architettura Inc. v. DSGN Assocs. Inc.*, 2018 WL 3428705, at *2 (N.D. Tex. July 13, 2018). Because Texas' long-arm statute extends jurisdiction to the limits of federal due process, this Court's personal jurisdiction analysis collapses into a single inquiry to determine whether the assertion of jurisdiction comports with the Due Process Clause of the United States Constitution. *Id.*

56.     This Court lacks general jurisdiction over the Bard Defendants because C. R. Bard is a New Jersey corporation with its principal place of business in New Jersey and BPV is an Arizona corporation with its principal place of business in Arizona. The Supreme Court has made it clear that, absent an "exceptional" case, a corporation is only subject to general jurisdiction where it is "at home," i.e., where it "is incorporated or has its principal place of business." *Daimler AG v. Bauman*, 134 S. Ct. 746, 760 (2014).[12] Because neither of the Bard Defendants is

_____

[12] As an example of an "exceptional" case, the Supreme Court pointed to *Perkins v. Benguet Consol. Mining*, 342 U.S. 437 (1952), where a Philippine company had temporarily made Ohio its

"at home" in Texas, this Court does not have general jurisdiction over Bard. *See, e.g., Architettura Inc.*, 2018 WL 3428705, at *3 (Northern District of Texas lacks general jurisdiction over the plaintiff's claims against corporate defendant that is incorporated and has its principal place of business in Massachusetts).

57.     There is also no specific jurisdiction over the Arizona Plaintiff's claims against the Bard defendants. In *Bristol-Myers*, the Supreme Court held that a court can maintain specific jurisdiction over a foreign corporation only when the suit "arise[s] out of or relate[s] to the defendant's contacts with the forum." 137 S. Ct. at 1780 (citations omitted). Facts related to a defendant's activities in the forum state unconnected to the plaintiff's specific claims in the lawsuit are irrelevant to a specific jurisdiction analysis. *Id.* at 1781 ("In order for a court to exercise specific jurisdiction over a claim, there must be an affiliation between the forum and the underlying controversy, principally, [an] activity or an occurrence that takes place in the forum State. . . . When there is no such connection, specific jurisdiction is lacking regardless of the extent of a defendant's unconnected activities in the State") (internal citations omitted; alterations in original).

58.     *Bristol-Myers* was a prescription drug case in which nonresident plaintiffs were seeking to establish specific jurisdiction over a defendant pharmaceutical manufacturer in products liability lawsuits filed in California. However, "the nonresidents were not prescribed [the drug] in California, did not purchase [the drug] in California, did not ingest [the drug] in California, and were not injured by [the drug] in California." *Id.* Because "all the conduct giving rise to the nonresidents' claims occurred elsewhere," there was no "connection between the

---

principal place of business. *Id.* at 756. The Bard Defendants have never made Texas their principal place of business.

forum and the specific claims at issue," and, as a result, "the California courts [could not] claim specific jurisdiction." *Id.* at 1781-82.

59.    Here, like in *Bristol-Myers*, the Arizona Plaintiff fails to allege sufficient facts to show that specific jurisdiction exists over her claims against the Bard Defendants. To the contrary, the Arizona Plaintiff alleges that she (a) is a resident of Arizona, ***not Texas*** (b) was implanted with a Bard IVC filter in Arizona, ***not Texas***, and (c) "is, and was at all times material herein, a resident of Kingman, Mohave County, Arizona," ***not Texas***. Pls.' Petition at ¶¶ 11; 111-13. Accordingly, it is most likely that the Arizona Plaintiff's alleged filter-related injuries occurred at home in Arizona.

60.    In prescription drug and device product liability cases, federal courts have recognized that specific jurisdiction only lies against a non-resident defendants like Bard in the state where the plaintiff was implanted with the subject medical device or ingested the drug at issue because that is where the plaintiff's claims arose. *See, e.g.*, *Fullerton v. Smith & Nephew, Inc.*, 2019 WL 2028712, at *4 (E.D. Mo. May 8, 2019) (rejecting argument that personal jurisdiction was proper in Missouri based on allegation that device "malfunctioned" in that forum, when the plaintiff was implanted with the device in Arkansas, and holding that plaintiff "failed to allege any facts connecting the failure of the medical device to Defendant's contacts with Missouri"); *Mitchell v. DePuy Orthopaedics, Inc.*, 2019 WL 2343847 (W.D. Missouri June 3, 2019) (dismissing for lack of personal jurisdiction where the plaintiff received a knee replacement implant while she lived in Kansas, then moved to Missouri, claiming that, after she moved there, Missouri was where she suffered injuries and where she sought treatment for her injuries); *In re Zostavax (Zoster Vaccine Live) Prod. Liab. Litig.*, 358 F. Supp. 3d 418, 423 (E.D. Pa. 2019) ("The relevant activity or occurrence with respect to Stanton took place in Edgartown,

Massachusetts when she received the Zostavax injection. The relevant activity or occurrence with respect to Morris took place in Connecticut where she was injected with Zostavax. The torts which allegedly caused their injuries happened in places other than Florida. While plaintiffs were long-time residents of Florida, Merck did nothing to and had no interaction with either of them in that state.").

61.     In short, here, there is no specific jurisdiction because Plaintiffs' petition contains no factual support connecting the Arizona Plaintiff's filter-related claims against Bard and resulting alleged injuries to the forum State of Texas. *See, e.g.*, *Arch Ins. Co. v. Tender Choice Foods, Inc.*, 2018 WL 4333994, at *4 (N.D. Tex. June 22, 2018) (no specific jurisdiction when Plaintiffs failed to allege sufficient facts showing that "the litigation resulted from alleged injuries that arise out of or relate to those activities" that occurred in Texas).

62.     Because there is no personal jurisdiction over the Arizona Plaintiff's claims against the Bard Defendants, that Plaintiff is fraudulently joined to this action because there is no reasonable basis to show that she can recover against Bard in this case in Texas. Thus, the Arizona Plaintiff's citizenship must be disregarded for the purposes of determining subject matter diversity jurisdiction as that citizenship relates to the citizenships of the properly joined Bard Defendants. *See Malone*, 2019 WL 7987110 at *3. After disregarding the citizenship of the Arizona Plaintiff, the Court can conclude that complete diversity exists as between the remaining Plaintiffs and the properly joined Bard Defendants.

###           ii.        The Plaintiffs' Claims Are Also Fraudulently Misjoined

63.     Under the fraudulent or procedural misjoinder doctrine, federal diversity jurisdiction exists "where diversity is destroyed only through misjoinder of parties." *In re Benjamin Moore & Co.*, 318 F.3d 626, 630-31 (5th Cir. 2002). The fraudulent misjoinder doctrine

originated with the decision of *Tapscott v. MS Dealer Serv. Corp.*, 77 F.3d 1353, 1360 (11th Cir. 1996), abrogated in part on other grounds by *Cohen v. Office Depot*, 204 F.3d 1069 (11th Cir. 2000). The fraudulent misjoinder doctrine "is particularly relevant to large pharmaceutical product liability actions." *In re Fosamax (Alendronate Sodium) Prods. Liab. Litig. (No. II)*, 2012 WL 1118780, at *3 (D.N.J. Apr. 3, 2012), *aff'd*, 751 F.3d 150 (3d Cir. 2014). The same can be said in the context of large medical device product liability actions. A court should determine whether it has diversity jurisdiction without taking into account the citizenship of any parties who have been fraudulently misjoined. *See Tex. Instruments Inc. v. Citigroup Global Mkts., Inc.*, 266 F.R.D. 143, 147 (N.D. Tex. 2010).

64.     "The fraudulent misjoinder doctrine has not been expressly adopted by the Fifth Circuit Court of Appeals, but the Court of Appeals has recognized the general principle in dicta, indicating that it could be applied under the appropriate circumstances, and several federal district courts in the Fifth Circuit have applied the doctrine." *Martinez v. Pfizer Inc.*, 388 F. Supp. 3d 748, 772–73 (W.D. Tex. 2019) (citations omitted); *see also Wells Fargo Bank, N.A. v. Am. Gen. Life Ins. Co.*, 670 F. Supp. 2d 555, 559 (N.D. Tex. 2009); *Tex. Instruments Inc.*, 266 F.R.D. at 147. Courts in the Fifth Circuit have considered fraudulent misjoinder when a plaintiff's claims against certain defendants are alleged to be misjoined with claims against other defendants, *see, e.g.*, *JYC Enterprise Inc. v. Allied Property & Casualty Ins.*, 230 F. Supp. 3d 734, 736-37 (S.D. Tex. 2017), as well as in the context of misjoinder of plaintiffs' claims in a multi-plaintiff lawsuit. *See, e.g.*, *Coleman v. Conseco, Inc.*, 238 F. Supp. 2d 804, 818-19 (S.D. Miss. 2002), abrogated on other grounds by *Davis v. ING Financial Advisers, LLC*, 2006 WL 8454341 (S.D. Miss. April 26, 2006).

65.    To determine whether a party is fraudulently misjoined, this Court should first consider whether misjoinder has occurred under Texas joinder law. *Martinez*, 388 F. Supp. 3d at 773. Texas Rule of Civil Procedure 40(a) "permits joinder of claims and defendants if: (1) there is asserted against them jointly, severally, or in the alternative any right to relief in respect of or arising out of the same transaction, occurrence, or series of transactions or occurrences and (2) at least one question of law or fact common to all of them will arise in the action."[13] (internal quotations omitted). *Id.* If the Court finds that a party is misjoined, it should then consider whether that misjoinder is fraudulent, which occurs when "misjoined parties and claims are wholly distinct with no real connection to each other such that their joinder is bordering on a sham." *Id.* at 774 (internal quotations omitted).

66.    This action has 10 Plaintiffs, each with their own individual IVC filter-related claims. The Plaintiffs' claims are fraudulently misjoined with one another because they do not arise out of the same transaction, occurrence, or series of transactions or occurrences and are wholly distinct with no real connection. Each Plaintiff's claims raise different factual issues, would be proved by different evidence, and, as to the claims against Bard, would raise different legal issues under numerous states' laws.

67.    **Different IVC Filters**: According to the Petition, Plaintiffs allegedly received one of four different retrievable Bard IVC filters: G2, Eclipse, Meridian, or Denali. *See* Petition at ¶¶ 90, 93, 95, 98, 100, 103, 105, 108, 111, and 114. Each of these filters has different designs and

---

[13] Texas' permissive joinder rule has the same standard as Federal Rule of Civil Procedure 20(a). *See Texas Instruments Inc.,* 266 F.R.D. at 148 ("The 'same transaction' requirement is governed by a logical-relationship test that is borrowed from federal law.").

was separately cleared for use by the FDA over the course of a decade.[14] At trial, evidence related to filter design will be unique for each filter model. Courts have found that plaintiffs' claims are not properly joined when they were each implanted with a different model of a medical device. *See*, *e.g.*, *Stinnette v. Medtronic Inc.*, 2010 WL 767558, at *2 (S.D. Tex. Mar. 3, 2010).

68.   **Different Alleged Injuries:** The Plaintiffs' Petition lacks any specificity regarding the injuries allegedly experienced by the majority of them as a result of their IVC filters. *See* Petition at ¶¶ 93-116. The Plaintiffs' failure to articulate specific injuries or failure modes supports Bard's claim that they are fraudulently misjoined. *See, e.g.*, *Stinnette*, 2010 WL 767558 at *2 ("If the plaintiffs were prescribed different models of Medtronic's devices, and the court must assume that is so since no specific model numbers used at the time of injury are given to the court, and these different models each malfunctioned in some way, then the inquiry necessarily focuses on different transactions or occurrences. The plaintiffs, therefore, have failed to show that their claims are properly joined."); *In re Fosamax*, 2012 WL 1118780, at *4 (finding misjoinder, where the plaintiffs "allege such unspecific injuries as to make it impossible to

---

[14] Unlike pharmaceutical cases, where the same basic pharmacological makeup is at issue, this action potentially involves four differently designed products. Thus, unlike pharmaceutical cases, this action does not necessarily involve common design or causation issues. *See, e.g.*, *See In re Prempro Prods. Liab. Litig.*, 591 F.3d 613, 623 (8th Cir. 2010) (noting the potentially "common question" of "the causal link between HRT drugs and breast cancer" as one reason for finding against egregious misjoinder). Indeed, quite the opposite is true here. The design defect issues will vary from filter-to-filter, given the four IVC filters allegedly at issue have different designs. As just one example of the design differences, the G2 Filter is fabricated from 12 separate non-electropolished nitinol wires, which are welded together to form the filter, whereas the Denali Filter is fabricated from a single piece of terminally electropolished nitinol tube, which is laser cut to form the arms and legs of the device. These differences in design will raise different design-defect issues in litigation involving these two devices. Moreover, these differences in design will raise different causation issues. For example, a Plaintiff who received a G2 may allege that the lack of a design feature (such as electropolishing in the example above) is a design defect, but she must still prove that the alleged defect caused her filter to fail. However, the same causation issue would not be present for a Plaintiff who received a Denali Filter.

determine how the Plaintiffs share any connection"); *In re Rezulin Prods. Liab. Litig.*, 168 F. Supp. 2d 136, 146 (S.D.N.Y Oct. 16, 2001) (holding plaintiffs misjoined where "they do not allege injuries specific to each of them so as to allow the Court to determine how many plaintiffs, if any, share injuries in common"); *Simmons v. Wyeth Labs.*, 1996 WL 617492, at *1 (E.D. Pa. Oct. 24, 1996) (plaintiffs misjoined where they "do not allege the exact nature of their injuries or damages, other than averring that plaintiffs experience one or more of numerous injuries and side effects"). For the three Plaintiffs that do allege some specificity regarding their alleged injuries, they are all different: Plaintiff Shaffer alleges "filter strut[] perforat[ion]" of her G2, Plaintiff Jones-Latimer alleges that her Denali filter "was deemed to not be retrievable," and Plaintiff Napolitano alleges that her Denali filter "tilted." *See* Petition at ¶¶ 92, 113, and 116.

69.     **The Plaintiffs' Different Medical Histories:** Each Plaintiff has a unique medical history, which includes the highly individualized conditions and symptoms their IVC filters were designed to treat. *See Boschert v. Pfizer, Inc.*, 2009 WL 1383183, at *3 (E.D. Mo. May 14, 2009) (holding plaintiffs misjoined where the only commonality was the drug ingested and citing cases finding misjoinder where plaintiffs "had different exposures to the drug, different injuries, and different medical histories" and where plaintiffs had many differences "including their unique medical histories"). The Plaintiffs' unique and highly individualized medical histories are another reason that joinder of their claims is improper under Texas Rule of Civil Procedure 40.

70.     **Different Physicians and Treatment:** According to the Petition, the IVC filters for the various Plaintiffs were implanted by different physicians, for different medical reasons, at different times, and at different medical facilities around the country. *See* Petition at ¶¶ 90, 93, 95, 98, 100, 103, 105, 108, 111, and 114. The surgeons likely had individualized and unique understandings of the risks and benefits of IVC filters, different experiences with their use of

IVC filters, and they likely conveyed different information to their patients. These important differences in the Plaintiffs' individualized claims make joinder particularly inappropriate here. *See, e.g., Hyatt v. Organon USA, Inc.*, 2012 WL 4809163, at *1 (E.D. Mo. Oct. 10, 2012) (plaintiffs misjoined where "[e]ach Plaintiff was injured at different times in different states allegedly from their use of NuvaRing that was presumably prescribed by different healthcare providers").

71.    **Different Dates of Implant:** According to the Petition, the Plaintiffs received their filters at different times over an approximately 10-year timeframe, ranging from June 2008 (Plaintiff Young) to June 2018 (Plaintiff Napolitano). *See* Petition at ¶¶ 90, 93, 95, 98, 100, 103, 105, 108, 111, and 114. The warnings, labels, and marketing materials for these products changed over time, as well as the relevant literature available at the time of the implant surgery. *See, e.g., Alday v. Organon USA*, 2009 WL 3531802, at *1 (E.D. Mo. Oct. 27, 2009) (plaintiffs misjoined where "[e]ach Plaintiff was injured at different times in different states allegedly from their use of NuvaRing that was presumably prescribed by different healthcare providers"); *In re Rezulin Prods. Liab. Litig.*, 168 F. Supp. 2d at 145 (prescription drug plaintiffs' claims fraudulently misjoined where they did not "allege that they received Rezulin from the same source or that they were exposed to Rezulin for similar periods of time" and where they alleged "different injuries"). Moreover, the relevant state of the art changed over that same 10-year timeframe, as did the medical community's understanding of the dynamic nature of the IVC.

72.    **Different State Law Applied to Plaintiffs' Claims Against Bard:** Finally, because Texas applies "the law of the state with the most significant relationship to the particular substantive issue," each Plaintiff brings claims against Bard that will be governed by his or her home state—where Plaintiffs received their IVC filters. *Duncan v. Cessna Aircraft Co.*, 665

S.W.2d 414, 421 (Tex. 1984). In this case, there are potentially eight (8) different states' laws involved.

73.     In sum, the Plaintiffs' claims do not arise out of the same transaction or occurrence because the only connection between their claims is that they were each allegedly implanted with one of Bard's retrievable IVC filters over an approximately 10-year timeframe. This is not sufficient to establish proper joinder. *See Stinnette*, 2010 WL 767558, at *2 ("A multitude of cases around the country have held that plaintiffs were not properly joined when the only common link among them was a defective drug or medical device."); *see also, e.g., In re Rezulin Prods. Liab. Litig.*, 168 F.Supp.2d 136, 145-46 (S.D.N.Y.2001) ("The plaintiffs . . . allege a defect (or defects) the precise contours of which are unknown and which may have caused different results-not merely different injuries-in patients depending on such variables as exposure to the drug, the patient's physical state at the time of taking the drug, and a host of other known and unknown factors that must be considered at trial with respect to each individual plaintiff."); *Graziose v. American Home Prods. Corp.*, 202 F.R.D. 638, 640 (D.Nev.2001) ("The only concrete similarity among the various Plaintiffs are that they (or their spouse) took a medicine containing PPA . . . and they allegedly suffered an injury. This is insufficient to justify joinder."); *In re Silica Prod. Liab. Litig.*, 398 F. Supp. 2d 563, 651 (S.D. Tex. 2005) (Plaintiffs in a products liability action were not properly joined when they "have no relevant connection to each other, outside of the fact that all are alleged to have been exposed to respirable silica").

74.     The Southern District of Texas case *Stinnette v. Medtronic Inc.* is instructive here. In that case, multiple plaintiffs brought product liability claims against the manufacturer of insulin pumps and infusion sets. *Stinnette*, 2010 WL 767558, at *1. The court held that the plaintiffs' claims were misjoined and "necessarily focus[] on different transactions and

occurrences" because the plaintiffs were prescribed different models of the medical devices and because each plaintiff's medical device malfunctioned in its own way. *Id.* at *2. Moreover, the court held that "it would still be prudent to separate each of the claims simply because there are potentially four different states' laws involved." *Id*. at *3. The facts of this case compel the same result as *Stinnette*. The Plaintiffs' claims, including those of the Arizona Plaintiff Cheryl Jones-Latimer, are clearly misjoined in this action.

75.     As noted above, the Plaintiffs received one of four different models of Bard IVC filters, received their filters for various different medical conditions, and received their filters over a 10-year timeframe. With the exception of three Plaintiffs, the Plaintiffs fail to specify (a) how their device allegedly failed[15]; (b) how long they had their IVC filters before they allegedly failed[16]; and (c) the nature and extent of their alleged injuries. None of the Plaintiffs specify what materials or information they or their doctors received from Bard that somehow support their failure to warn and negligent misrepresentation claims.

76.     Egregiousness can also be inferred by the simple fact that the Plaintiffs have attempted to misjoin a single Arizona Plaintiff to this action[17] filed in Texas state court, where

---

[15] The failure modes at issue in other Bard IVC filter cases include alleged filter fracture, filter migration, filter tilt, filter perforation, and inability to retrieve. Each of these failure modes are recognized in the medical community as complications that are associated with every brand of retrievable IVC filter. Moreover, and important to the present analysis, each of these failure modes raises significantly different issues in terms of IVC filter design and warnings. For example, in a case involving an alleged filter fracture, the case may turn on whether the fracture was caused by fatigue, what caused the fatigue crack, and whether some abnormality in the plaintiff's IVC attributed to the fracture. On the other hand, in a case involving an alleged filter migration, the case may turn on whether the plaintiff's IVC is larger than the indicated diameter for the filter, or whether the doctor implanted the device correctly.

[16] The length of indwell of an IVC filter may be a factor in analyzing how or why it allegedly fractured, migrated, tilted, or perforated the IVC.

[17] Additionally, this case is one of 49 separate actions filed in Dallas County Texas with total of 489 plaintiffs.

the Plaintiffs fail to allege any connection between the Arizona Plaintiff and the State of Texas. The Petition is devoid of any factual allegation supporting the joinder of the Arizona Plaintiff with the other Plaintiffs other than as an artifice to prevent Bard from exercising its federal rights under 29 U.S.C. §§ 1332 and 1441, *et seq.* In the absence of any factual allegations connecting the Arizona Plaintiff to the state of Texas, this filing suggests that the sole purpose of the Arizona Plaintiff's joining this action is to defeat federal diversity jurisdiction. *See Wecker v. Nat'l Enameling & Stamping Co.*, 204 U.S. 176, 186 (1907) ("Federal courts should not sanction devices intended to prevent a removal to a Federal court where one has that right."); *Federated Dep't Stores, Inc. v. Moitie*, 452 U.S. 394, 398 n.2 (1981) (courts "will not permit plaintiff to use artful pleading to close off defendant's right to a federal forum."). Under these circumstances and the command set forth in *Wecker*, the District Court clearly has the authority to sever the Arizona Plaintiff under Fed. R. Civ. P. Rules 20 and 21 on the grounds that she has been improperly joined and her citizenship shall therefore not be considered for purposes of determining whether diversity jurisdiction exists.[18]

77.     The egregiousness of the Plaintiffs' misjoinder is also supported by the fact that only one of the 10 Plaintiffs are citizens of Texas. This single Texas plaintiff has been joined together with nine (9) other out-of-state Plaintiffs in a single suit in a not-so-thinly veiled attempt

---

[18] In addition, Bard notes that Rule 21 "permits a district court to retain diversity jurisdiction over a case by dropping a non-diverse party if that party's presence in the action is not required under Federal Rule of Civil Procedure 19." *Safeco Inc. Co. of Am v. City of White House*, 36 F.3d 540, 545 (6th Cir. 1994); *see, e.g.*, *Elliott v. Tilton*, 89 F.3d 260, 262 (5th Cir. 1996) ("We recognize that under *Newman-Green, Inc. v. Alfonzo-Larrain*, this Court has the authority to dismiss dispensable nondiverse parties."); *Cortez v. Frank's Casing Crew & Rental Tools*, No. CIV.A. V-05-125, 2007 WL 397488, at *2 (S.D. Tex. Jan. 31, 2007) ("Rule 21 . . . permits district courts to dismiss non-diverse parties who are not indispensable so long as it does not prejudice any of the parties.").

to forum shop, taxing the Texas court system even though the state has extremely little interest in the outcome of the matter.

78.    Accordingly, because the Plaintiffs claims are fraudulently misjoined, this Court should disregard the citizenship of the Arizona Plaintiff and properly allow the removal of this matter under fraudulent misjoinder jurisprudence. *See In re Fosamax*, 2012 WL 1118780, at *5. Alternatively, this Court should sever the Arizona Plaintiff's case and remand it to state court while exercising jurisdiction over the majority of Plaintiffs who are diverse from Bard.

## OTHER PROCEDURAL REQUIREMENTS FOR REMOVAL ARE MET

79.    All properly joined and served Defendants join in this removal. 28 U.S.C. § 1446(b)(2)(A). Because Defendant McKesson Corp. has been fraudulently joined, its consent is not needed for removal to federal court because the application of "this requirement to improperly or fraudulently joined parties would be nonsensical, as removal in those cases is based on the contention that no other proper defendant exists." *Jernigan v. Ashland Oil Inc.*, 989 F.2d 812, 815 (5th Cir. 1993).

80.    Written notice of the filing of this Notice of Removal is being served on all parties through their counsel of record. A copy of this Notice of Removal will be promptly filed with the Clerk of the 101st Judicial District Court of Dallas County, Texas.

81.    Copies of all process, pleadings and orders, as well as the docket sheet and index of all pleadings relating to this case and previously filed with the 101st District Court of Dallas County, Texas are attached hereto as Exhibits D-1 –D-9 for the Court's reference.

WHEREFORE Defendants C. R. Bard, Inc. and Bard Peripheral Vascular, Inc. respectfully give notice that the above-captioned action currently pending in the 101st Judicial District Court of Dallas County, Texas is removed to the United States District Court for the Northern District of

Texas, Dallas Division. Should any issue arise as to the propriety of this removal, Defendants C. R. Bard, Inc. and Bard Peripheral Vascular, Inc. respectfully requests the opportunity to provide briefing and oral argument on the same.

Respectfully submitted,

*/s/Melissa Dorman Matthews*
Melissa Dorman Matthews
Texas Bar No. 00790603
mmatthews@hartlinebarger.com
Jordan E. Jarreau
Texas Bar No. 24110049
jjarreau@hartlinebarger.com
**HARTLINE BARGER LLP**
8750 N. Central Expy., Suite 1600
Dallas, Texas 75231
Telephone: (214) 369-2100
Facsimile: (214) 267-4271

**ATTORNEYS FOR DEFENDANTS**
**C. R. BARD, INC. AND**
**BARD PERIPHERAL VASCULAR, INC.**

## **CERTIFICATE OF SERVICE**

I hereby certify that on the 12th day of June, 2020, a true and correct copy of the foregoing document was served upon all known counsel of record via ECF in accordance with the Federal Rules of Civil Procedure.


/s/ *Melissa Dorman Matthews*
Melissa Dorman Matthews